1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

ADVANCED RISK MANAGERS, LLC,

Case No. 19-cv-03532-DMR

8

Plaintiff,

9

v.

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

10

EQUINOX MANAGEMENT GROUP, INC.,

Re: Dkt. No. 87

11
12

Defendant.

13        Plaintiff Advanced Risk Managers, LLC ("ARM") filed this breach of contract action

14  against Defendant Equinox Management Group, Inc. ("Equinox").  Equinox now moves for

15  summary judgment.  [Docket No. 87.]  This matter is suitable for resolution without a hearing.

16  Civ. L.R. 7-1(b).  For the following reasons, the motion is denied.

17  **I.        BACKGROUND**

18        **A.        Factual Background**

19        This contract dispute involves Equinox's alleged failure to pay ARM, a consulting

20  company that offers medical claims review services for insurance and reinsurance companies.

21  [Docket No. 96-1 (Pfeffer Decl., Feb. 18, 2021) ¶ 2, Ex. 1 (Choi Dep.) 17.]  Equinox's services

22  include facilitating claims management between insurance companies and its reinsurer clients.

23  Pfeffer Decl. ¶ 4, Ex. 3 (McAndrew Dep.) 16-19.]  One of Equinox's clients is third-party

24  Renaissance Reinsurance U.S. Inc. ("RenRe"), a reinsurance company that issues coverage to

25  health insurance companies.  [*See* Docket No. 90 (McAndrew Decl., Feb. 4, 2021) ¶ 4.]

26        RenRe hired Equinox as the Managing General Underwriter to manage reinsurance claims

27  from insurance companies on its behalf.  McAndrew Decl. ¶ 3.  This included RenRe's

28  reinsurance agreements or "treaties" with Humana Insurance Company ("Humana"), Geisinger

Health Plan ("Geisinger"), and Louisiana Health Cooperative, Inc. ("LAHC").  *Id.*  Equinox's role included paying small claims on behalf of RenRe, compiling documentation, investigating claims, and facilitating negotiations of claims between RenRe and the insureds.  McAndrew Dep. 113-15; Pfeffer Decl. ¶ 5, Ex. 4 (Morr Dep.) 19.  Equinox would review Humana and Geisinger claims and make payment recommendations to RenRe.  Pfeffer ¶ 3, Ex. 2 (Philipps Dep.) 33-35.  RenRe employees Gerry Morr or Samantha Engel would then instruct Equinox to pay, deny, or take other action on the claims.  *Id.* at 36.

The Humana and Geisinger reinsurance treaties involved large claims that required "someone who specializes in reviewing hospital bills and large catastrophic charges to … determine whether the charges were proper[]."  Equinox was not able to perform that work by itself.  Philipps Dep. 40, 42-43.  In 2015, RenRe's Engel recommended that Equinox retain ARM to assist in that work, after having reviewed claim review samples provided by ARM's president Mimi Choi.  Pfeffer Decl. ¶ 6, Ex. 5 (Engel Dep.) 77, 80-81; Philipps Dep. 40.

### 1.    ARM's Agreement with Equinox

On September 3, 2015, Equinox and ARM executed an Agreement for Consulting Services under which ARM would perform claims review services for Equinox.  [Docket Nos. 89 (Cross Decl., Feb. 4, 2021) ¶ 35, Ex. 23 (the "Agreement"); Ex. 4 (Choi Decl., Oct. 8, 2019) ¶ 8.]  It lists Norbert Phillips, Equinox Claims Account Manager, as the Equinox "Company Representative."  Agreement; McAndrew Dep. 71.  Equinox and ARM are the only parties to the Agreement.  However, RenRe reimbursed Equinox for the cost of ARM's services.  McAndrew Dep. 68; Cross Decl. ¶ 17, Ex. 5.  Multiple individuals at both Equinox and RenRe reviewed and approved the Agreement prior to its execution.  Philipps Dep. 51-52; McAndrew Dep. 67-68; Engel Dep. 89-90; Morr Dep. 51-52.

Pursuant to the Agreement, ARM reviewed hospital bills on behalf of RenRe.  According to Equinox, ARM reviewed the hospital bills and prepared "report[s] challenging potentially invalid charges;" RenRe would then use the reports "to assess whether insurers were paying claims appropriately, and potentially in seeking to reduce the amount it was required to reimburse."  McAndrew Decl. at ¶ 5.

The Agreement states that "[f]or each assignment" that Equinox gave to ARM, the parties were to "draft a Description of Services . . . that describes the services that ARM will perform and the items that ARM will deliver (the 'Services'); the schedule or duration of the Services; and the fees that [Equinox] will pay in return."  Agreement ¶ 1.  It further provides that "[i]n order for ARM to perform the services effectively, [Equinox] will provide ARM with information and tools that are listed in the Description of Services."  *Id*.  Exhibit A to the Agreement, titled "Description of Services," is expressly incorporated into the Agreement.  Agreement ¶ 1, Ex. A (Description of Services).

The Description of Services states that ARM will provide certain services to Equinox, only one of which is at issue here.  ARM's "Large Claims Integrity Review and Negotiation" service "focused on maximized claims savings and cost utilization through diligent large claims billing accuracy and appropriateness review."  It encompasses two categories: 1) "Pre-payment Review and Negotiation," which occurs when the medical provider has not yet been paid for their services; and 2) "Post Payment Claims Review," which involves claims where the medical provider has already been paid.  Description of Services § I(B); Choi Dep. 78; Phillipps Dep. 53-54.  It is undisputed that the claims in this case all fall within the "Post Payment Claims Review" category.  Choi Dep. 77-78; McAndrew Dep. 103; Phillipps Dep. 54.

The Description of Services provides that ARM would review the itemized bills to identify problems such as duplicates, errors, "[o]ff label or experimental protocols," "[p]harmaceuticals billed in excess of manufacturer's recommended dosages," and situations where there is "[n]o supporting diagnosis or surgical procedure for billed items."  ARM would then provide Equinox with "a review summary" upon completion of the review.  Description of Services § I(B).

As to payment for ARM's services, there are two bullet points under the "Fees" section for post payment claims review:

- For internal claims reference only and no claims reduction will be applied, this service is billed at $195/hour.

- When the review is used to facilitate post-payment adjudication, settlement, or resolution of the claim, this service is billed at 28% of net claims reduction savings.

3

United States District Court
Northern District of California

*Id.* The Agreement also contains a provision about the payment process:

> 3.1. <u>Invoice</u>. ARM shall invoice [Equinox] at the end of each calendar month in accordance with the fees and expenses as set forth in the Description of Services.
>
> 3.2. <u>Payment</u>. Payment on the invoices is due and payable within Twenty (15) [sic] days of [Equinox's] receipt of the invoice. ARM invoices shall be sent to the address and individual set forth in the Description of Services.

Agreement § 3.

Choi testified that when Equinox first sent her claims to review, she assumed it was for "internal" use only, to be billed at ARM's hourly rate. Choi Dep. 64-65, 109, 115-16. Through the course of its work under the Agreement, ARM submitted hourly invoices under the "internal claims reference only" provision, billed at the $195 hourly rate. McAndrew Decl. ¶ 6; Choi Dep. 109. ARM never invoiced Equinox under the "28% of net claims reduction savings" provision. Choi Dep. 108-09, 116. It is undisputed that Equinox fully paid all of ARM's invoices for hourly work. *See* McAndrew Decl. ¶ 6.

### 2. ARM's Agreement with RenRe, Subsequent Lawsuit, and October 2018 Settlement

In 2017, RenRe started sending some work directly to ARM, instead of passing the work to ARM through Equinox. On May 22, 2017, ARM executed an Agreement for Consulting Services with RenRe. Cross Decl. Ex. 36 (RenRe Agreement). It listed Morr as the RenRe company representative. *Id.* The RenRe Agreement is nearly identical to the ARM/Equinox Agreement, and contains an identical fee provision:

- For internal claims reference only and no claims reduction will be applied, this service is billed at $195/hour.

- When the review is used to facilitate post-payment adjudication, settlement, or resolution of the claim, this service is billed at 28% of net claims reduction savings.

RenRe Agreement Ex. A.

As discussed below, the parties dispute the scope of work performed by ARM under the RenRe Agreement. The RenRe Agreement itself is silent on this issue. Equinox asserts that ARM performed work on certain Geisinger claims under the RenRe Agreement, and not under its

4

Agreement with Equinox.  Although not entirely clear, ARM appears to contend that it worked on LAHC claims pursuant to the RenRe Agreement.  *See* Opp'n 11 (citing Choi Decl. ¶ 3).

On December 12, 2017, ARM filed a lawsuit against RenRe for breach of the RenRe Agreement (the "RenRe Action").  Cross Decl. Ex. 3 (Complaint).  ARM alleged that its audit of certain LAHC claims "created net savings of $1,742,384.93" for RenRe and that under the RenRe Agreement, RenRe "is required to pay [ARM] 28% of this net savings amount: $487,867.78."  *Id.* at ¶¶ 8, 9, 12; Choi Decl. ¶ 3.  The RenRe Action was removed to this court and assigned to the Honorable Jon S. Tigar.  *Advanced Risk Managers, LLC v. Renaissance Reinsurance U.S., Inc.*, Case No. 18-cv-00264-JST (N.D. Cal., removed Jan. 11, 2018).

Following a settlement conference, the parties in the RenRe Action reached a settlement of ARM's claims and executed a "Release Agreement."  Cross Decl. Ex. 21 (Release).  ARM and RenRe executed the Release on October 16 and 17, 2018, respectively.  The Release also included Equinox as a signatory, even though Equinox was not a party in the RenRe action.  *Id.*[1]  The Release contains the following language:

> **Release by ARM and Ms. Choi.**  ARM and Ms. Choi . . . hereby irrevocably and unconditionally, knowingly, and voluntarily, release, acquit, and forever discharge each of [RenRe] and Equinox, and each of their heirs, executors, administrators, representatives, agents, officers, shareholders, partners, predecessors, successors, and assigns (the "RR Releasees") from all claims related to or arising from the Dispute or which ARM or Ms. Choi may otherwise have against the RR Releasees, whether known, unknown, suspected, or unsuspected, which exist or may have existed from the beginning of time through the effective date of this Agreement.

Release ¶ 2.  It also contains a California Civil Code section 1542 waiver specifying that unknown claims were released:

> **California Civil Code § 1542.**  Each party waives any and all rights under California Civil Code Section 1542, which states:
>
> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF**

---

[1] Choi understood that Equinox was included in the release because it was "the managing general underwriter for the policyholders on the 10 [LAHC] claims that were part of the LACH Audit." Choi Decl. ¶ 7.

United States District Court
Northern District of California

**EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Release ¶ 4.  ARM and RenRe voluntarily dismissed the RenRe Action on October 31, 2018.  [Docket No. 58 (Case No. 18-cv-00264-JST).]

### 3.    RenRe's Settlement of the Humana and Geisinger Program Claims in February 2018 and November 2018

ARM provided auditing services in connection with reinsurance claims under the Humana and Geisinger programs in 2016 and 2017.  *See, e.g.*, Cross Decl. Ex. 31 (Apr. 21, 2017 summary by ARM); Ex. 10 (Nov. 1, 2017 summary by ARM); Ex. 8 (Nov. 1, 2017 summary by ARM); Ex. 27 (Jun. 23, 2017 summary by ARM); Exs. 15, 17 (emails between ARM and Equinox re: Humana claim); Ex. 28 (Mar. 10, 2017 summary by ARM); Ex. 41 (Apr. 5, 2016 summary by ARM).[2]

RenRe challenged some of the claims made by Humana and Geisinger.  *See* McAndrew Decl. ¶ 16; Cross Decl. Exs. 22, 34; Engel Decl. ¶ 3; Engel Dep. 125-26.  In September 2017, after Humana sent a letter to Equinox regarding the dispute, RenRe began negotiating directly with Humana.  Cross Decl. Ex. 34; Engel Dep. 121-22.  Unbeknownst to ARM, during the course of the negotiations, Equinox communicated to Humana some of the findings that ARM had documented as part of its audit.  Engel Dep. 127-129.

 On February 21, 2018, RenRe and Humana executed a settlement agreement that resolved all outstanding claims.  Cross Decl. Ex. 13 (settlement agreement between RenRe and Humana).  Pursuant to the settlement, RenRe and a co-reinsurer obtained a discount on the Humana claims.  Cross Decl. Ex. 24; Pfeffer Decl. Ex. 15.

As to the Geisinger disputes, RenRe withheld over $4 million in payments to Geisinger for the 2015 and 2016 treaty years.  Cross Decl. ¶ 30, Ex. 18.  RenRe and Geisinger reached a settlement of all of those claims on November 13, 2018.  Engel Decl. ¶ 3.

Equinox did not inform ARM about the Humana and Geisinger program settlements.

---

[2]   As previously noted and as will be discussed further below, the parties dispute whether ARM's services on certain Geisinger claims fell under the Agreement or the RenRe Agreement.

United States District Court
Northern District of California

1    Phillipps Dep. 163, 204; McAndrew Dep. 130-31, 159; Morr Dep. 103, 168; Engel Dep. 152, 178.

2    Choi got an inkling of their existence at the October 2018 settlement conference in the RenRe

3    Action, when she heard comments about "some sort of settlement." Choi Dep. 184-85. In

4    November and December 2018, ARM followed up with emails to Equinox asking for information

5    about the settlements in order to determine whether it was entitled to additional fees. On

6    December 5, 2018, Choi wrote "[i]f there are savings based on [ARM's] review, we need to

7    submit additional invoices." Pfeffer Decl. Ex. 23 (Dec. 5, 2018 email from Choi to Phillipps and

8    McAndrew). She noted that she was attaching "[c]ases that ARM has reviewed for Equinox," and

9    requested "the final outcome, specifically $ as settlement or closed cases." *Id*. Equinox twice

10   directed ARM to RenRe, which did not respond to ARM's inquiry. *Id*.

11          On December 13, 2018, an attorney for RenRe sent a letter to ARM's counsel demanding

12   that ARM and Choi "cease and desist" from pursuing any claims against RenRe and Equinox

13   because ARM had released any such claims in its October 2018 settlement of the RenRe Action:

14          It has come to our attention that despite executing the [October 17,
        2018 release agreement], ARM and Ms. Choi have subsequently

15      asserted that they possess additional claims against Equinox (and/or
        RenRe). ARM and Ms. Choi's pursuit of any such claim is in plain

16      breach of the Agreement. Therefore, we demand that ARM and Ms.
        Choi cease and desist from the pursuit of any such claims, including,

17      among other things, requesting further information regarding such
        claims.

18

19   [Docket No. 109-1 (Punzalan Decl., Aug. 10, 2012) ¶ 5, Ex. A (Dec. 13, 2018 letter).]

20          On January 23, 2019, an attorney for Equinox sent a letter to ARM's counsel regarding

21   ARM's "request[ ] [for] information from Equinox regarding the 'final outcome' for claims that

22   were reflected on a spreadsheet that your client sent to Equinox along with such request." Compl.

23   Ex. A. The attorney wrote that "[a]ll of the claims on your client's spreadsheet pre-date the

24   [October 17, 2018] Release Agreement, and, thus, they were released and discharged by it."

25   Therefore, he continued, "[t]hose claims could not provide a basis for any additional invoices from

26   ARM to Equinox, and ARM has no need for the information it requested. Accordingly, Equinox

27   will not provide any information that it may have." *Id*.

28

### B.   Procedural History

ARM filed this lawsuit against Equinox on June 19, 2019, alleging that its audit of 37 claims "created savings in the amount of $8,812,123.71 for Equinox"; accordingly, "the potential net saving fees that Equinox owes to ARM is $2,467,394.64, which is 28% of the validated savings created by ARM's audit."  Compl. ¶ 13.  ARM further alleges that after completing its services, it requested that Equinox provide the amount of net savings it achieved from using ARM's audit so that ARM could calculate its fee and invoice Equinox, but that Equinox refused to provide that information, thereby preventing ARM from calculating the amount it is owed.  *Id*. at ¶¶ 14, 15.  ARM asserts four claims for relief: 1) breach of the agreement between ARM and Equinox; 2) anticipatory breach of contract; 3) breach of the implied covenant of good faith and fair dealing; and 4) declaratory relief.

The court granted ARM leave to file an amended complaint on November 19, 2020.  [Docket Nos. 72-1 (FAC), 73.]  In the FAC, ARM revised the number of claims at issue to raise it from 37 to 42 claims.  FAC ¶ 13.

Equinox now moves for summary judgment.

## II.   LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor.  *Id*. at 248.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id*. at 249.

To defeat summary judgment once the moving part has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that

a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.   DISCUSSION

This litigation centers on ARM's review of 42 claims made by 14 claimants.  Of the 14 claimants, Humana insured eight and Geisinger insured six.  FAC ¶ 13; Pfeffer Decl. ¶¶ 10, 11, Exs. 9, 10.

### A.  Equinox's Arguments

Equinox argues that if ARM had any valid claims against Equinox, they accrued prior to, and were released pursuant to the October 2018 Release executed by ARM in connection with the RenRe Action which included Equinox as a released party.  Mot. 13, 16.  According to Equinox, ARM's claims accrued when the work was performed, ARM billed Equinox an hourly fee for the work, and Equinox paid the invoices in full, all of which happened prior to the October 17, 2018 effective date of the Release.  Mot. 17.

Alternatively, Equinox argues that if ARM's claims accrued when RenRe reached settlements with Humana and Geisinger, all of the Humana claims settled on February 21, 2018, well before the effective date of the Release.  ARM therefore released any claims based on its work on the Humana program.

As to the seven Geisinger claims which settled on November 13, 2018 *after* the effective date of the Release, Equinox contends that only two of those claims were assigned to ARM by Equinox.  In both of them, "there is no evidence that these claims were resolved after the Release date on the basis of ARM's audit work."  Mot. 17, 21-22.  Therefore, "no post-release savings were achieved as a result of ARM's work."  *Id.* at 19.  With respect to the remaining five claims under the 2016 Geisinger program, Equinox contends that it is not liable for these claims because

United States District Court
Northern District of California

ARM performed the work for RenRe pursuant to the RenRe Agreement, and not for Equinox. Mot. 18-19.

Finally, and separate from its arguments relating to the Release, Equinox contends that ARM cannot recover any sums under the "28% of net claims reduction savings" provision because it already invoiced its hourly rate to Equinox and has been paid in full under the hourly rate provision and is not entitled to payment under both.  Mot. 22.

### B.   ARM's Arguments

ARM disputes that the Release covers any of its claims in this lawsuit.  It argues that the Release only affects claims that accrued prior to its execution on October 17, 2018.  ARM contends that none of its claims accrued before that date because 1) the Geisinger settlement occurred after the date of the Release and thus any claims related to the Geisinger program "could not possibly have been released"; 2) Equinox concealed the facts of and details about the Humana and Geisinger settlements from ARM, which delayed the accrual of ARM's claims until it received notice of the settlements during this lawsuit; and 3) ARM's claims did not accrue until Equinox breached its obligation to provide ARM with information on the settlements, which did not happen until January 2019.  Opp'n 15.

ARM also asserts that it performed all of the work on the claims at issue under the Agreement, and that none of the work was performed under the RenRe Agreement.  It further responds that whether its work directly resulted in savings to RenRe is irrelevant to its entitlement to payment of "28% of net claims reduction savings accrued," because the Agreement does not provide that ARM may receive payment under the percentage of savings fee provision only if its work actually resulted in claims savings.  Opp'n 18-22.

Finally, it argues that the Agreement's fee provision is not drafted as an "either/or" entitlement and allows for both payment of an hourly fee and "28% of net claims reduction savings accrued."  Opp'n 22.

### C.   Analysis

#### 1.  Whether ARM Released its Claims

Equinox's primary argument is that ARM released any claims it had against Equinox on

United States District Court
Northern District of California

October 17, 2018, the effective date of the Release in the RenRe Action.  Both parties frame the

critical question as whether ARM's claims accrued prior to October 17, 2018 and are therefore

barred.  Unfortunately, neither side briefed the legal doctrine of accrual or adequately analyzed

when each of ARM's three claims for relief accrued.[3]  The court ordered the parties to submit

supplemental briefing addressing "each of ARM's claims for relief, identifying the dates of

accrual for each claim with reference to all elements of each claim," including citations to

applicable law and specific evidence in support of their positions.  [Docket No. 105.]  The parties

timely filed the supplemental briefing.  [Docket No. 107 (Def.'s Supp. Br.), 109 (Pl.'s Supp. Br.).]

California law applies to federal diversity cases arising in California.  *Allstate Ins. Co. v.

Smith*, 929 F.2d 447, 449 (9th Cir. 1991).  Under California law, a claim accrues "at the time when

the cause of action is complete with *all* of its elements."  *Buschman v. Anesthesia Bus.

Consultants LLC*, 42 F. Supp. 3d 1244, 1250 (N.D. Cal. 2014) (emphasis in original) (quoting *Fox

v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005)).  To establish a breach of contract,

ARM must show "(1) the existence of the contract; (2) [its] performance or excuse for

nonperformance; (3) [Equinox's] breach; and (4) the resulting damages to [ARM]."  *Oasis W.

Realty, LLC v. Goldman*, 51 Cal. 811, 821 (2011) (citation omitted).  With respect to the fourth

element, a breach of contract claim does not accrue until the plaintiff "show[s] an 'actionable and

appreciable' harm beyond mere nominal damages."  *Buschman*, 42 F. Supp. 3d at 1251 (citing

*Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000)).

Equinox's supplemental brief focuses on the timing of alleged breaches of the Agreement

and the resulting harm to ARM.  According to Equinox, the Agreement provides that ARM "was

entitled to be paid only one fee for its work and was never entitled to both an hourly and outcome-

based fee for the same work"; therefore, it argues, ARM "only ever had a single 'claim' for a fee

---

[3] ARM's fourth claim for relief is for declaratory relief.  However, "declaratory relief is not an independent cause of action"—only a remedy.  *VIA Techs., Inc. v. SONICBlue Claims LLC*, No. C 09-2109 PJH, 2010 WL 2486022, at *3 (N.D. Cal. June 16, 2010); *see also Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983) ("The Declaratory Judgment Act does not provide an independent jurisdictional basis for suits in federal court. It only permits the district court to adopt a specific remedy when jurisdiction exists.").

United States District Court
Northern District of California

with respect to each audit." Def.'s Supp. Br. 1.  Noting that ARM invoiced Equinox for its hourly fee for all work it performed under the Agreement, Equinox contends that any breach had to have been in the form of Equinox's failure to pay ARM's invoices within 20 days.  Stated another way, Equinox argues that any claims would have accrued when ARM completed an audit, sent Equinox an invoice for the work performed, and Equinox failed to pay within 20 days, thus breaching the Agreement.  Based on this logic, Equinox contends that the latest date that any breach of contract claim could have accrued under the Agreement was July 13, 2017, which is 21 days after ARM sent its final invoice to Equinox.  [*See* Docket No. 108 (2d Cross Decl., Aug. 3, 2021) ¶ 24 (chart of ARM invoices showing final invoice to Equinox dated 6/22/17), Ex. A (invoices to Equinox and RenRe).]  Any claims based on the failure to pay ARM pursuant to the Agreement were released in October 2018, well after the date of the final invoice.  There is no dispute that "ARM's invoices were timely paid in full."  Def.'s Supp. Br. 2.  Therefore, it argues, ARM cannot establish any breach by Equinox or resulting harm.  *Id.*  Equinox offers no other theory regarding the accrual of ARM's breach of contract claim.

In response, ARM disputes the dates of Equinox's breach and ARM's resulting damages. ARM contends that the Agreement permitted it to charge both an hourly fee and a percentage of savings fee, *see* Opp'n 23-24, and that the Agreement "affirmatively obligates Equinox to provide ARM with the amount of savings it achieves so that ARM can invoice for its 28% share of those savings."  Pl.'s Supp. Br. 3; Opp'n 5, 17.  It notes that the Agreement does not specify a deadline by which Equinox must provide ARM with the information necessary to calculate its 28% share, but that under California law, "a reasonable time is allowed" for performance.  Pl.'s Supp. Br. 3 (citing Cal. Civ. Code § 1657).  ARM contends that Equinox never provided ARM with that information, "meaning that breach occurred at the expiration of that reasonable time," which ARM states is a question of fact and inappropriate for resolution on summary judgment.  Pl.'s Supp. Br. 3-4.  ARM further argues that its damages did not accrue until it "experienced actual, pecuniary loss at the point at which it *should* have been paid its 28% fee by Equinox and was not."  *Id.* at 4 (emphasis in original).  It argues that the timing of its damages is also a question of fact that cannot be resolved on summary judgment.  *Id.*

United States District Court
Northern District of California

1    In the alternative, ARM argues that because Equinox failed to inform it of the Humana and

2    Geisinger settlements, the delayed-discovery rule tolls accrual of its breach of contract claim until

3    December 13, 2018, the date that Equinox demanded that ARM "cease and desist" from pursuing

4    any claims against Equinox, including requesting information regarding such claims.  *Id*. at 4-5

5    (citing Dec. 13, 2018 letter).

6    The threshold issue in evaluating the parties' accrual arguments is whether the Agreement

7    entitled ARM to only one fee, as Equinox argues, or whether it could seek both an hourly fee and

8    the 28% of savings fee under the agreement, as ARM contends.  Equinox contends that the two

9    payment provisions are "mutually exclusive" and did not entitle ARM to payment under both

10   provisions.  Mot. 22; Reply 11; Def.'s Supp. Br. 1.  According to Equinox, "the [fee] provision is

11   clear on its face" that "the hourly fee applies 'only' when the work is for internal claims reference,

12   whereas the percentage fee applies when the work is used to resolve the claim rather than purely

13   for internal reference purposes."  Reply 11.  Equinox goes on to argue that because ARM billed

14   Equinox at its hourly rate, it is precluded from now seeking payment under the percentage of

15   savings provision.  Mot. 22-23.

16   In response, ARM contends that the two payment provisions are not mutually exclusive,

17   and that they permit ARM "to charge both an hourly fee and a percent of savings fee where its

18   work was initially requested for internal claims reference but was subsequently used for claims

19   adjudication, settlement, and resolution."  Opp'n 23.

20   Both parties offer evidence to support their proffered interpretation of the fee provision.

21   Neither side briefed the standard the court must apply in interpreting the language of the

22   Agreement.

23   Under California law, "[a] contract must be so interpreted as to give effect to the mutual

24   intention of the parties as it existed at the time of contracting."  Cal Civ. Code § 1636.  "When a

25   contract is reduced to writing, the intention of the parties is to be ascertained from the writing

26   alone, if possible."  Cal. Civ. Code § 1639.  "The language of a contract is to govern its

27   interpretation, if the language is clear and explicit, and does not involve an absurdity," Cal. Civ.

28   Code § 1638, and the words of a contract are to be understood in their "ordinary and popular sense

13

unless used by the parties in a technical sense or a special meaning is given to them by usage." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641. "Summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *United States v. King Features Ent., Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

However, "[u]nder California law, even if the written agreement of the parties is clear and unambiguous on its face, the trial judge must consider relevant extrinsic evidence that can prove a meaning to which the language of the contract is reasonably susceptible." *Id.* The language of a contract is considered ambiguous if it is "reasonably susceptible" to more than one interpretation. *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1994). When the meaning of contractual language is disputed, the court must engage in a two-step process to determine whether to admit extrinsic or parol evidence to show that an ambiguity exists and to resolve the ambiguity. *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996); *see also Centigram Argentina, S.A. v. Centigram Inc.*, 60 F. Supp. 2d 1003, 1007 (N.D. Cal. 1999).

"First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party." *Winet*, 4 Cal. App. 4th at 1165. "Extrinsic evidence includes testimony regarding the circumstances in which a contract was written, the subsequent conduct of the parties, and the common usage of particular terms in a given industry." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006) (citations omitted). Whether language in a contract is ambiguous is a question of law. *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903 (1986); *see also Winet*, 4 Cal. App. 4th at 1165 ("The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact.").

Second, "[i]f in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second

United States District Court
Northern District of California

1   step—interpreting the contract." *Winet*, 4 Cal. App. 4th at 1165.  If extrinsic evidence is admitted

2   at the second step, but "the competent parol [or extrinsic] evidence is not conflicting, construction

3   of the instrument is a question of law." *Id.* at 1166; *Miller*, 454 F.3d at 990.  "However, if the

4   interpretation turns upon the credibility of conflicting extrinsic evidence, or if 'construing the

5   evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's

6   position,' summary judgment is inappropriate." *Miller*, 454 F.3d at 990; *Morey*, 64 Cal. App. 4th

7   at 912-913 ("Where the interpretation of contractual language turns on a question of the credibility

8   of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function.

9   As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence

10  properly admitted to interpret the language of a contract.") (emphasis in original, citations

11  omitted).  "If, after considering the language of the contract and any admissible extrinsic evidence,

12  the meaning of the contract is unambiguous, a court may properly interpret it on a motion for

13  summary judgment." *Miller*, 454 F.3d at 990.

14      As noted, the Agreement contains two fee provisions:

15  - For internal claims reference only and no claims reduction
    will be applied, this service is billed at $195/hour.

16

17  - When the review is used to facilitate post-payment
    adjudication, settlement, or resolution of the claim, this
    service is billed at 28% of net claims reduction savings.

18

19  The parties dispute whether ARM may seek payment under both provisions.  ARM contends that

20  it may collect under both, while Equinox asserts that ARM is not entitled to payment under the

21  second fee provision because it has already been paid under the first.  Neither party's analysis is

22  grounded in the legal standard for contract interpretation at summary judgment.

23      The court concludes that the contract language unambiguously allows for payment under

24  only one of the two provisions.  In the first provision, the use of the word "only" means that the

25  hourly rate applies if ARM's review is only for "internal claims reference . . . and no claims

26  reduction will be applied."  Conversely, the hourly rate *does not* apply if the review is used for

27  something *other* than "internal claims reference only and no claims reduction will be applied."

28  *See, e.g., Adams v. MHC Colony Park, L.P.*, 224 Cal. App. 4th 601, 621 (2014) ("the word 'only'

1   is not ambiguous.  When a contract says 'only A,' it means 'A and nothing else.'  The phrase

2   'only A' cannot be construed reasonably to mean 'A, B or C.' . . . the meaning of the word 'only is

3   clear and explicit.'").  If ARM's work is used for certain purposes *other* than internal claims

4   reference, i.e., "to facilitate post-payment adjudication, settlement, or resolution of the claim"—

5   the second "percentage of savings" fee provision applies.  Therefore, under the clear terms of the

6   Agreement, ARM is entitled to payment under only one of the fee provisions.

7       However, even if a court finds that a contract is "clear and unambiguous on its face, [it]

8   must consider relevant extrinsic evidence that can prove a meaning to which the language of the

9   contract is reasonably susceptible."  *King Features*, 843 F.2d at 398.  The court's first step in this

10  process is to provisionally consider the extrinsic evidence in order to determine whether the

11  language of the agreement is reasonably susceptible to the parties' competing interpretations.

12      In support of its position that ARM is entitled to fees based on both an hourly rate *and*

13  percentage of savings, ARM notes Choi's testimony that the work she performed on the 42 claims

14  at issue fell under both fee provisions.  Opp'n 23 (citing Choi Dep. 59-60 (the work ARM

15  performed was "for both bullet points [of the provision]"); 112 ("It would be for both.  It would be

16  for internal and claims adjudication.")).  Choi described ARM's work on one invoice as both

17  "work to facilitate post-payment settlement or adjudication of appeal, [and] work done for internal

18  claim reference purposes."  *Id*. at 113.  In response to questioning about the circumstances under

19  which a client would "owe both an hourly rate and a contingency fee for the same work," Choi

20  testified:

21          That depends on the claim, specific claim referral. . . . first, when they
            sent the claim, they may say it's just for this, and then later on it
22          changes, which kind of like what happened here.

23  *Id*. at 113-14.  Choi explained that she billed the hourly rate for the claims at issue "[b]ecause at

24  the beginning, [she] thought [Philipps] . . . just wanted the information," and then "later on when

25  [she] . . . found out that they were using the claims to adjudicate," her "intent was to look at that

26  and bill the 28 percent" after the appeal was complete, "depending on the appeal outcome."  *Id*. at

27  116-17.

28      Equinox relies on the following evidence to support its position that the agreement entitled

16

ARM to fees based on an hourly rate only:

- Choi testified that ARM has "been in business" for 14 years, and that over ten years ago, ARM "billed a client on both an hourly and percentage of savings basis for the same work" on post payment claims review, but later clarified that she could not actually remember if the assignment was for post-payment claims review or pre-payment review.  Choi Dep. 145-46, 221-22.  According to Equinox, this testimony shows that in 14 years of being in business, "ARM could not recall charging any customer both an hourly fee and a percentage of savings fee for the same work."  2d Cross Decl. ¶ 20.

- McAndrew, who executed the Agreement on behalf of Equinox, testified that he understood the payment provision to be "either-or," "[b]ut it's not both" an hourly fee and a percentage of savings; "[i]t's like almost getting paid twice if you're getting paid an hourly fee and a percentage of savings."  McAndrew Dep. 72-73.

- Phillipps testified that all of the Humana and Geisinger program claims assigned to ARM were post-payment reviews and that he "was aware that ARM would be paid $195, I believe, per hour."  Phillipps Dep. 53-54, 58.

*See* Mot. 23; Reply 11; Def.'s Supp. Br. 1.  Additionally, Equinox contends that the fact that ARM invoiced Equinox its hourly rate for its work "reflected the parties' agreement and expectation that ARM would be paid on an hourly and not a percentage-of-savings basis for the work in question."  Mot. 23.

Having provisionally considered the parties' extrinsic evidence, the court finds that the contract language is not reasonably susceptible to ARM's interpretation that it is entitled to payment under *both* fee provisions due to the word "only" in the first fee provision: "for internal claims reference only and no claims reduction will be applied, this service is billed at $195/hour." Neither Choi's testimony nor ARM's analysis of the evidence addresses the use of the word "only" in the first fee provision.  Accordingly, the court finds that ARM's extrinsic evidence does not "prove[ ] a meaning to which the language of the agreement is reasonably susceptible." *See, e.g., King Features*, 843 F.2d at 398.

As to Equinox's interpretation, McAndrew's testimony supports the court's conclusion that

United States District Court
Northern District of California

1   the plain language of the Agreement entitles ARM to payment under only one of the fee

2   provisions, and not both.

3           However, this does not end the analysis.  Nothing in the Agreement or Equinox's extrinsic

4   evidence addresses the situation that ARM contends happened here; namely, that Choi initially

5   believed ARM's work was for "internal claims reference only" and accordingly billed Equinox the

6   hourly rate, but later learned that the work was used "to facilitate post-payment adjudication,

7   settlement, or resolution," which was covered by the percentage of savings provision.  Equinox

8   does not point to any contractual language to support its interpretation that once ARM billed its

9   hourly rate, it could never seek payment under the second fee provision, even if circumstances

10  changed such that the ARM's work no longer satisfied the express requirements of the first fee

11  provision.

12          For its part, without providing any explanation or analysis, ARM suggests that a jury may

13  "require additional information regarding what should happen if a claims review is initiated under

14  instructions that it is for 'internal claims reference only,' but then is used 'to facilitate post-

15  payment adjudication, settlement, or resolution."  Opp'n 23.

16          The court concludes that as a matter of law, the Agreement's fee provision is "clear and

17  unambiguous" that ARM is entitled to payment under only one of the two provisions.  Summary

18  judgment is thus granted as to ARM's claim that it may collect payment under both provisions.

19  The remaining question is how the Agreement governs payment where ARM initially billed (and

20  was paid) the hourly rate under the first provision, but later learned that its work fell under the

21  second provision.  As noted, neither party briefed this issue or provided any contractual analysis.

22  The court concludes that nothing in the Agreement prevents a reasonable jury from finding that

23  under such circumstances, ARM would be entitled to payment under the second fee provision, less

24  any amounts already paid under the first fee provision.  As a result, Equinox is not entitled to

25  summary judgment on ARM's breach of contract claim based on its position that "ARM cannot

26  retroactively claim payment under an alternative payment provision" despite already having

27  received payment of its hourly rate.  *See* Mot. 22.

28          The court now turns back to the issue of accrual of ARM's breach of contract claim.  ARM

18

asserts that Equinox breached the Agreement by failing to pay ARM under the percentage of savings provision. Equinox does not address the accrual date of this claim. Instead, it focuses on its argument that ARM received payment of its hourly rate for all work performed and is therefore precluded from seeking payment under the percentage of savings provision, and that the latest date that any claim could have accrued was in July 2017, or 21 days after the date of ARM's final invoice of its hourly rate to Equinox and over a year before the October 17, 2018 release. Def.'s Supp. Br. 3.

For its part, ARM makes the following accrual argument. First, ARM addresses the breach element of its contract claim, and asserts that the date of the breach is a material disputed fact. ARM argues that under the Agreement, Equinox was obligated to inform ARM of the existence and amount of any settlements so that ARM could submit an invoice for "28% of net claims reduction savings." Opp'n 5, 17. Without that information, ARM could not calculate the percentage due and invoice Equinox. The Agreement does not expressly address the issue or specify a deadline by which Equinox must provide any such settlement information. Under California law, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." Cal. Civ. Code § 1657. "What constitutes a 'reasonable time' for performance is a question of fact" and "depends on the situation of the parties, the nature of the transaction and the facts of the particular case." *Henry v. Sharma*, 154 Cal. App. 3d 665, 670, 672 (1984).

ARM contends that it is owed sums under the percentage of savings provision for two settlements: the Humana and Geisinger program claims settlements. With respect to the Humana-based claims, RenRe settled the Humana claims in February 2018, eight months before the Release. It is undisputed that neither Equinox nor RenRe ever informed ARM of the fact or the amount of the settlement. Philipps Dep. 163; McAndrew Dep. 130-31; Morr Dep. 102-03; Engel Dep. 152. ARM contends that a reasonable jury could find that eight months is a reasonable time for Equinox to prepare and provide information to ARM so that it could calculate its fee, and that its failure to do so constitutes a breach of the Agreement.

Next, ARM argues that the date of accrual of damages (the final element of its breach of

1  contract claim), is also a disputed material fact.  ARM contends that it experienced actual,

2  pecuniary loss at the point at which it *should* have been paid the 28% of net claims reduction

3  savings fee.  *See Buschman*, 42 F. Supp. 3d at 1250 ("where monetary damages is an element of [a

4  claim], accrual of the action does not occur until pecuniary loss is suffered").  The Agreement

5  provided that ARM was to invoice Equinox on a monthly basis and that invoices were payable

6  within 20 days but does not specify a deadline by which ARM was to invoice for particular work.

7  Agreement § 3.  According to ARM, California law "implies a reasonable time period for that

8  deadline."  Pl.'s Supp. Br. 4 (citing Cal. Civ. Code § 1657).  Therefore, it contends, to determine

9  the date that ARM was damaged, the finder of fact would first determine a reasonable time for

10  Equinox to provide ARM with settlement information, add a reasonable time for ARM to submit

11  an invoice reflecting the amount due, and then add 20 days for Equinox to pay the invoice.  *Id.*

12  ARM argues that a reasonable jury could conclude that the resulting period of time exceeds the

13  eight months between the Humana settlement and the Release, which means that ARM's claim

14  based on the percentage of savings provision with respect to the Humana settlement had not

15  accrued by October 17, 2018, the date ARM released its claims against Equinox.  *Id.*

16       For its part, Equinox disputes that it had any obligation to share the Humana and Geisinger

17  program settlement information with ARM.  It argues that the Agreement contains no express

18  language imposing such a duty, and that there was no implied duty to provide settlement

19  information after ARM received payment of its hourly fee because it could seek payment under

20  only one provision.  Reply 6-7.

21       Both parties fail to meaningfully analyze the critical question.  ARM says that Equinox

22  was obligated to provide ARM with information about the Humana and Geisinger settlements

23  sufficient for ARM to calculate its 28% fee.  However, ARM does not adequately explain the

24  source of this obligation by pointing to contractual language or arguing the existence of an implied

25  term.  Similarly, Equinox does not grapple with the argument that even in the absence of an

26  express contract term, it makes sense that the Agreement required Equinox to provide settlement

27  information to ARM because without it, ARM would never be able to invoice Equinox under the

28  second fee provision.

United States District Court
Northern District of California

The court is not required to undertake an analysis where the parties have failed to provide it themselves. Summary judgment on the question of whether ARM released its Humana-based contract claims is denied on that basis. A jury will need to sort this out, guided by appropriate jury instructions.[4]

Turning to the parties' arguments regarding the Geisinger-based claims, RenRe settled the Geisinger program claims in November 2018, one month after the Release. Neither Equinox nor RenRe informed ARM of the fact or the amount of that settlement. Philipps Dep. 203-04; McAndrew Dep. 158-59; Morr. Dep. 168; Engel Dep. 178. ARM argues that since the settlement occurred after the Release, Equinox's breach with regard to that settlement "necessarily postdates" the Release, as did ARM's resulting damages. Pl.'s Supp. Br. 4. Equinox does not dispute that the Geisinger settlement took place after the Release. It makes other arguments that ARM is not entitled to any payment in connection with that settlement which are discussed below. Def.'s Supp. Br. 3-4. The court finds that a reasonable jury could conclude that ARM's breach of contract claim with respect to the Geisinger settlement had not accrued as of October 17, 2018. Therefore, summary judgment on the ground that ARM released its Geisinger-based claims is denied.

### 2. Whether Equinox Is Liable for Payment of Fees for Work Assigned to ARM by RenRe

Equinox argues that ARM performed audits of several Geisinger program claims pursuant to the RenRe Agreement, and not the Agreement between ARM and Equinox. As a result, RenRe, not Equinox, is "contractually responsible for any fees associated" with that work. Mot. 18-19.

Equinox points to the following evidence to support its position. ARM audited seven claims under the 2015 and 2016 Geisinger treaties, five of which arose under the 2016 Geisinger treaty. *See* Mot. 7-8 (chart of Geisinger claims). In February 2017, RenRe's Morr notified ARM that "RenRe began handling the Geisinger account in-house beginning with the 7/1/16 contract year," and that Equinox's Phillipps would "continue managing claims with exposure in the prior

---

[4] As the court finds that a reasonable jury could conclude that ARM's breach of contract claim had not accrued by October 17, 2018, it need not reach ARM's alternative argument that its claims accrued at a later date based on the delayed discovery rule.

years." Cross Decl. Ex. 7 (Feb. 21, 2017 email to Choi). Consistent with Morr's representation, Engel testified that RenRe entered into its "own fee agreement with ARM to perform services on [RenRe's] behalf with respect to the 2016 treaty year. Engel Dep. 157-58 ("for the '16 treaty year, we had taken back the claims payment responsibilities from Equinox"). In April 2017, Choi emailed Morr regarding work on a claim falling under the 2016 Geisinger treaty: "Previously, we have received the large inpatient claim from 2015 policy year from Norbert [Phillipps] for bill review. Are you the one doing the 2016 policy year review?" Morr responded, "[t]his is the [Geisinger patient] portion of the claim for the 2016 year so Norbert isn't involved." Cross Decl. Ex. 35 (Apr. 19, 2017 email chain between Choi and Morr).

Equinox also submits evidence that RenRe, not Equinox, assigned work on the 2016 Geisinger treaty claims directly to ARM; that ARM submitted its reports on the 2016 Geisinger treaty claims directly to RenRe; and that ARM submitted invoices for its work on these claims to RenRe. Mot. 7-8 (chart of Geisinger claims).[5] Additionally, although neither the RenRe Agreement nor ARM's Agreement with Equinox specifies the scope of work under each contract, each agreement required ARM to invoice the "Company," which was identified as Equinox in the agreement between Equinox and ARM, and as RenRe in the agreement between RenRe and ARM. Equinox Agreement § 3.1; RenRe Agreement § 3.1. Based on this evidence, Equinox argues that the undisputed facts show that ARM performed work on the 2016 Geisinger treaty claims for RenRe and that RenRe, and not Equinox, is responsible for any outstanding payments for work performed by ARM on its behalf.

ARM disputes Equinox's contention that it performed work on any of the claims at issue in this lawsuit pursuant to the RenRe Agreement. It cites Choi's testimony that ARM worked on all of the relevant claims pursuant to its contract with Equinox, not RenRe. Opp'n 18. For example, Choi testified that of the 42 claims at issue in this litigation, ARM "did no work for any of those patients that was subject to" ARM's contract with RenRe. Choi Dep. 86, 87. She testified that

---

[5] Equinox contends that RenRe, not Equinox, "paid every ARM invoice that it received on the [Geisinger treaty year] 2016 claims," but did not submit evidence supporting this assertion. *See* Mot. 6.

even when Morr assigned claims to ARM and ARM invoiced RenRe for the work, ARM's client for the work was still Equinox.  *Id.* at 94-97.  Choi also testified that when she delivered work to RenRe pursuant to its requests, she "thought it would be RenRe who would be paying [ARM]," which is why she sent a corresponding invoice to RenRe, but that she "thought it was Equinox' [sic] client."  *Id.* at 99-100, 104-105 (discussing two claims for the same patient, one received from Equinox and the other from RenRe: "[the patient] is the Equinox client.  It's under the group of Equinox clients, so it would be Equinox's contract.").[6]

It is undisputed that ARM performed at least some Geisinger work for RenRe under its Agreement with Equinox.  ARM points to evidence to support that it performed all Geisinger work under the Agreement, while Equinox focusses on evidence from which a reasonable juror could conclude that some of ARM's work on Geisinger claims took place under the RenRe Agreement.  At summary judgment, the court cannot make credibility determinations or weigh conflicting evidence; these duties "are within the province of the factfinder at trial."  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).  "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party.  The nonmoving party's evidence must be taken as true."  *T.W. Elec. Serv*., 809 F.2d at 631.  Choi's testimony that ARM's work on the 2016 Geisinger treaty claims fell under the Agreement, along with the undisputed fact that ARM performed work on at least some Geisinger claims under the

---

[6]  ARM also cites testimony by Phillipps.  In response to the question, "[t]he Geisinger program claims that are at issue in this lawsuit were sent to ARM under the contract we looked at in Exhibit 3; correct?" Phillipps stated, "[t]he claims we sent to them were under the same contract that we had been discussing between Equinox and ARM."  Phillipps Dep. 178.  ARM contends that this testimony "confirm[s]" Choi's account that ARM's agreement with Equinox governed all of the Geisinger program claims, regardless of treaty year.  Opp'n 18.  A reasonable juror might disagree with that characterization.  Right before the testimony cited by ARM, Phillipps stated that he did not know the number of Geisinger claims that "were sent to ARM for review" and that "Equinox may have sent a certain number of claims to [ARM], but after [RenRe] took over, it was out of my hands, and whether Gerry [Morr] decided to send something to any of them or not, I'm not aware of."  Phillipps Dep. 177.  Therefore, Phillipps's statement about "[t]he claims we sent to them" falling "under the contract . . . between Equinox and ARM" could be a reference to the specific claims *Equinox* sent to ARM, and not a reference to *all* of the Geisinger program claims.

United States District Court
Northern District of California

Agreement, is sufficient to create a genuine dispute of fact on this issue.  Summary judgment on the ground that ARM's work on these claims did not fall under the Agreement is therefore denied.

### 3. Whether ARM is Entitled to Payment Even if Its Work Did Not Result in Post-Release Savings

Finally, Equinox argues that ARM is not entitled to payment under the percentage of savings fee provision because "no savings of any kind were achieved after the Release as a result of ARM's work."  Mot. 19-20.  It contends that "Equinox cannot be in breach of an obligation subject to a condition precedent—here, savings achieved as a result of ARM's work—if the condition never occurred," and submits evidence purportedly demonstrating that "no individual claim assigned by Equinox to ARM was reduced for any reason following the Release."  *Id.* at 20 (citing *Bennett v. Carlen*, 213 Cal. App. 2d 307 (1963); McAndrew Decl. ¶ 9).

Contrary to Equinox's assertion, the Agreement does not state that ARM is entitled to payment under the percentage of savings fee provision only if its work resulted in savings.  The provision states that "[w]hen the review is used to facilitate post-payment adjudication, settlement, or resolution of the claim, this service is billed at 28% of net claims reduction savings."  Description of Services § 1(B).  Equinox provides no support for reading a causal requirement into the language of the Agreement.  Based on the plain language of the percentage of savings fee provision, the only condition precedent to a payment obligation is that ARM's review be "used to facilitate post-payment adjudication, settlement, or resolution of the claim."  Equinox offers no evidence that ARM's work was *not* "used to facilitate post-payment adjudication, settlement, or resolution of the claim[s]" at issue.  Accordingly, summary judgment on this basis is denied.

### 4. ARM's Remaining Claims

ARM's remaining claims are for anticipatory breach of contract and breach of the implied covenant of good faith and fair dealing.  Equinox's briefing barely mentions them, and its position appears to be wholly derivative of the outcome on the breach of contract claim.  Summary judgment is therefore denied on these claims.

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment is denied.

1

2

The court will hold a further CMC on October 20, 2021 at 1:30 p.m.  An updated joint CMC statement is due by October 13, 2021.

3

4       **IT IS SO ORDERED.**

5   Dated: September 17, 2021

6

7



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California